UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE

```
*************************************
                                    *
Kerri A. Gannon,                    *
                                    *
        Plaintiff                   *      COMPLAINT
                                    *      Jury Trial Requested
v.                                  *
                                    *
Catholic Medical Center,            *
                                    *
        Defendant                   *
                                    *
*************************************
```

NOW COMES the plaintiff Kerri A. Gannon, by and through her attorneys Douglas, Leonard & Garvey, P.C., and respectfully submits the within Complaint, stating as follows:

**I.     Parties**

1.     The plaintiff Kerri A. Gannon is a former employee of the defendant and resides at 12 Sesame Street, Raymond, New Hampshire.

2.     The defendant Catholic Medical Center is a New Hampshire corporation with a principal place of business at 100 McGregor Street, Manchester, New Hampshire.

**II.    Jurisdiction and Venue**

3.     The Court has subject matter jurisdiction pursuant to 29 U.S.C. §1132(e)(1) over the plaintiff's claim for violation of 29 U.S.C. §1166(a)(1).  The Court may exercise supplemental jurisdiction over the plaintiff's State law claim.  The Court has personal jurisdiction over the defendant because it is a resident of New Hampshire.

4.     Venue is proper pursuant to 29 U.S.C. §1132(e)(2) because the defendant resides in this judicial district and because the breach that is the subject of this action occurred within this judicial district.

### III.     Facts

5.     Ms. Gannon began her employment with the defendant as a Licensed Nursing Assistant on or about May 11, 2015, at a starting rate of pay of $12.75 per hour.

6.     Ms. Gannon performed her job well. She consistently received "successful" performance evaluations throughout her employment with the defendant. In her most recent performance review completed on or about July 5, 2019, her supervisor stated, "We are fortunate to have Kerri as part of our team," noting that Kerri is "a hard worker who cares for her patients." Ms. Gannon's supervisor also commented on Ms. Gannon's dedication to Catholic Medical Center, noting that "Kerri has expressed she 'wants to retire here at CMC' and that 'we are a family.'"

7.     Ms. Gannon regularly received raises throughout her employment with the defendant. She received her last pay increase in or around February of 2020, when her base rate of pay rose to $16.32 per hour.

8.     On or about March 20, 2020 (seven (7) days after Governor Sununu first declared a state of emergency in New Hampshire related to the COVID-19 pandemic), Ms. Gannon battled a sinus headache. She contacted the office of her primary care provider, Dr. DeLuca, who advised Ms. Gannon to stay out of work and who faxed a note that morning to the defendant's Employee Health department restricting Ms. Gannon from work.

9.     The defendant's Employee Health department called Ms. Gannon the same day, advising her that it had scheduled her to take a mandatory COVID test the following day. Ms. Gannon submitted to her mandatory COVID test on March 21, 2020, at the Armory in Manchester, New Hampshire.

10. Ms. Gannon was next scheduled to work on March 24, 2020, but the defendant's Employee Health department called her on or about March 23, 2020, instructing her not to report to work on March 24, 2020, and further advising her that she could not return to work until Employee Health received the results of her COVID test.

11. On or about March 27, 2020, the defendant's Employee Health department called Ms. Gannon, advising her that her COVID test results were damaged and that she would need to be retested the following day.

12. Ms. Gannon complied with the defendant's instructions and submitted to a second COVID test at the Armory in Manchester, New Hampshire, on March 28, 2020.

13. The defendant's Employee Health department advised Ms. Gannon on or about March 30, 2020, that her COVID test results were negative and that she could return to work on April 3, 2020.

14. Before Ms. Gannon returned to the Hospital to work shifts, she was required to visit the Hospital on or about April 1, 2020, to be "fit-tested" for an N-95 mask so she could work on the Hospital's COVID floor.

15. In the March/April 2020 time period, Ms. Gannon was generally scheduled to work Friday, Saturday and Sunday nights, from 7 p.m. until 7 a.m. the following morning.

16. Before Ms. Gannon returned from her absences related to Dr. DeLuca's work restriction and the Hospital's directive that she remain out of work until her COVID test results came back, Ms. Gannon received a message from her supervisor, Patty Labrie, instructing her that LNAs such as she were not allowed to call the staffing office with any scheduling questions. LNAs such as Ms. Gannon were required to log onto software called "Kronos" in order to check their schedules.

17. The afternoon of April 3, 2020, Ms. Gannon received a call from Abby at the Hospital's staffing office, advising Ms. Gannon that the defendant was canceling the first four (4) hours of her shift because of the low amount of patients. Ms. Gannon asked Abby how she should determine if she should report to work for her next 4-hour block beginning at 11 p.m. Abby advised Ms. Gannon that Ms. Gannon could call her, notwithstanding the general prohibition on employees calling the staffing office. Ms. Gannon called Abby twice through the night, first to learn that her 11 p.m.-3 a.m. shift was canceled, and later to learn that her 3 a.m.-7 a.m. shift was canceled.

18. Ms. Gannon worked each of her scheduled 7 p.m.—7 a.m. shifts that began on Saturday, April 4, 2020, and Sunday, April 5, 2020. Ms. Gannon also worked the nights of April 10 and April 11.

19. In the late afternoon of April 12, when Ms. Gannon was showering in preparation for her shift, the defendant called her and left her a voice mail message advising her that it had canceled her shift from 7 p.m. through 11 p.m. Ms. Gannon logged onto Kronos later in the evening and found no changes in her status. Ms. Gannon did not call the defendant's staffing department because no one had told her that she had any exemption from the general prohibition on calling the staffing department, distinguishing this night from the night of April 3-4, when Abby had told Ms. Gannon she could call. No one from the defendant's staffing department called Ms. Gannon as the night progressed. Ms. Gannon inferred that the defendant had canceled her shifts for the night, so she retired.

20. Nobody from the defendant's management personnel contacted Ms. Gannon on April 13, April 14, April 15 or April 16.

4

21.     On or about April 17, 2020, the defendant's Human Resources Business Partner, Jane Delmar, left Ms. Gannon a voice mail message requesting a call back.  When Ms. Gannon contacted Ms. Delmar, the Human Resources Business Partner directed her to call the Director of the Float Pool, Holly.  Ms. Gannon had been scheduled to work that night.

22.     Ms. Gannon complied with the request, whereupon Holly greeted her by asking, "What happened to you Sunday night?  I thought you were in a car accident.  You didn't call." Despite's Holly's professed belief that Ms. Gannon had been in a car accident, Ms. Gannon had received no call from Holly in the five (5) days that had elapsed since Sunday, Ms. Gannon explained to Holly that she received a message at approximately 5:15 p.m. on the afternoon of April 12 telling her that the defendant had canceled the first 4 hours of her shift, that she had checked Kronos twice during the night and had found her status unchanged, that nobody from the defendant's staffing department had called her again during the night of April 12, and that she had not called the staffing department because of the general prohibition upon doing so.  Ms. Gannon explained to Holly that she had believed the defendant had canceled her shifts, based on these circumstances.

23.     After Ms. Gannon explained to Holly the events of April 12-13, Holly told Ms. Gannon that she intended to call Human Resources and would then call Ms. Gannon back.

24.     The Director of the Float Pool, and Human Resource Business Partner Delmar, called Ms. Gannon a short while later to advise her that the defendant was terminating her, effective immediately, "due to excessive absenteeism."  In tabulating Ms. Gannon's so-called "excessive" absences, the defendant included the days when the defendant had prohibited Ms. Gannon from attending work because it had not yet received her COVID test results.

5

25. The defendant provided Ms. Gannon with health insurance, dental insurance and eye care insurance as employment benefits at the time of her termination.

26. In the termination phone conference, Human Resource Business Partner Delmar advised Ms. Gannon that Ms. Gannon would be receiving paperwork regarding continuing her health insurance coverage under COBRA.

27. On or about April 23, 2020, Ms. Gannon called Ms. Delmar regarding a copy of her last paystub. Ms. Gannon advised Ms. Delmar in the conversation that she had yet to receive the promised information about continuing her health insurance coverage. Ms. Delmar replied that she was working from home and that she had told "them" to mail it to Ms. Gannon.

28. Ms. Gannon has had no further communications with the defendant since April 23, 2020.

29. At no time since Ms. Gannon's termination has the defendant provided Ms. Gannon any information about her rights and obligations with respect to electing COBRA coverage.

30. The defendant's failure to provide Ms. Gannon information about electing COBRA coverage has prejudiced her, causing her to be without health insurance from May of 2020 through the present, causing her to forgo seeking medical care as a result, and causing her to have to pay for prescription medications that were either free of charge, or carried minimum co-payments, under the health insurance coverage provided her through her employment with the defendant.

## COUNT I

### (Violation of 29 U.S.C. §1166)

31. The allegations of the preceding paragraphs are realleged and incorporated herein by reference.

32. The Consolidated Omnibus Budget Reconciliation Act (COBRA) requires that employees receive notice of their right to continue coverage under their employer's group health plan after a "qualifying event," such as termination of employment, pursuant to 29 U.S.C. §1166(a)(4). After a qualifying event such as termination, two (2) notice requirements are triggered. First, the employer must notify the group health plan administrator of the employee's qualifying event within thirty (30) days of such event, pursuant to 29 U.S.C. §1166(a)(2). Second, the plan administrator must notify qualified beneficiaries of their right to continue coverage under the group health plan within fourteen (14) days of receiving notification of the qualifying event from the employer, pursuant to 29 U.S.C. §1166(a)(4)(A). "When the employer and the plan administrator are the same entity, the employer has forty-four (44) days from the date of the qualifying event to notify qualified beneficiaries of the right to maintain coverage." Rodriguez v. Int'l College of Business and Tech., Inc., 364 F.Supp.2d 40, 45 (D.P.R. 2005).

33. "Generally, notice must be sufficient to allow the qualified beneficiary to make an informed decision about whether to elect coverage." Id. at 47. "Adequate notice typically requires that the beneficiary be advised that (1) he can choose continuation coverage after certain qualifying events, (2) he has sixty days from the date that coverage would cease to elect to continue the coverage, (3) he may continue coverage for a maximum of eighteen months, and (4) he has an obligation to pay premiums." Id.

34. The defendant failed to provide Ms. Gannon with timely notice, or any notice for that matter, relating to her rights and obligations with respect to electing to continue coverage under the defendant's group health plan.

35. The defendant acted with bad faith in failing to provide Ms. Gannon the required notice of her COBRA rights.  The defendant failed to meet its notice obligation, despite the fact that it knew of the obligation and was explicitly reminded of it by Ms. Gannon.

36. Ms. Gannon has suffered prejudice, and continues to suffer prejudice, as a result of the defendant's failure to provide her the required notice of her COBRA rights.  She has gone without health insurance, has chosen not to seek medical treatment for illness because of her lack of health insurance when otherwise she would have done so, and has paid out of her own pocket for prescription medications that she had been able to obtain for free, or for a minimal co-pay, under the defendant's group health plan.

37. Pursuant to 29 U.S.C. §1132(c )(1) and 29 C.F.R. §2575.502c-1, the defendant is liable to Ms. Gannon for penalties of up to $110.00 per day for its failure to provide her the requisite COBRA notice.

38. Ms. Gannon is further entitled to her reasonable attorney's fees and costs.  29 U.S.C. §1132 (g)(1).

## COUNT II

### (Wrongful Discharge)

39. The allegations of the preceding paragraphs are realleged and incorporated herein by reference.

40. The defendant fired Ms. Gannon with bad faith and/or malice, as exhibited by, among other things: (a) the defendant faulted Ms. Gannon for absences from work <u>that the</u>

<u>defendant itself required Ms. Gannon to take</u> related to the outstanding status of her COVID test results; (b) the defendant faulted Ms. Gannon for not calling regarding her scheduling, when the defendant itself had prohibited Ms. Gannon and similarly situated employees from placing such calls; (c) the defendant stated its suspicion (in a conversation with Ms. Gannon just before her termination) that she had been in a car accident five (5) days earlier, but in that 5-day period the defendant failed to contact Ms. Gannon to check on her well-being; (d) the defendant fired Ms. Gannon without providing her legally required notice of her COBRA rights, despite the defendant's knowledge of its obligation to do so and the defendant's promises to Ms. Gannon to do so; and (e) the defendant fired Ms. Gannon in a terse phone conversation without giving her any prior warning that her employment was in any jeopardy.

41. The defendant further fired Ms. Gannon for performing acts encouraged by public policy. Public policy encouraged Ms. Gannon to remain out of work pursuant to the defendant's directives while she awaited results of her COVID test, so as to avoid the danger that she might infect other Hospital employees and Hospital patients if she in fact were infected with COVID-19.

42. As a direct and proximate result of the defendant's wrongful discharge of Ms. Gannon, Ms. Gannon has suffered and continues to suffer damages, including without limitation lost wages, lost employment benefits, emotional distress, humiliation, inconvenience and loss of enjoyment of life, plus interest and costs. Ms. Gannon is further entitled to enhanced compensatory damages based on the wanton, malicious and/or oppressive nature of the defendant's conduct in firing her.

WHEREFORE, the plaintiff Kerri A. Gannon respectfully prays this Honorable Court:

A. Schedule this matter for trial by jury, and after trial;

  B. Award the plaintiff statutory penalties based on the defendant's violation of 29 U.S.C. §1166(a)(4);

  C. Award the plaintiff her reasonable attorney's fees pursuant to 29 U.S.C. §1132(g)(1);

  D. Award the plaintiff damages for lost wages and lost employment benefits;

  E. Award the plaintiff damages for emotional distress, humiliation, inconvenience and loss of enjoyment of life;

  F. Award the plaintiff enhanced compensatory damages;

  G. Award the plaintiff interest and costs; and

  H. Grant such other and further relief as is just and equitable.

            Respectfully submitted,
            KERRI A. GANNON
            By her attorneys,
            DOUGLAS, LEONARD & GARVEY, P.C.

Date: August 12, 2020    By: /s/ Benjamin T. King
            Benjamin T. King, NH Bar #12888
            14 South Street, Suite 5
            Concord, NH 03301
            (603) 224-1988
            benjamin@nhlawoffice.com